## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| MARCUS D. WOODSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. CIV-06-546-D |
| | ) | |
| OKLAHOMA STATE DEPARTMENT OF | ) | |
| HEALTH,[1] GARFIELD COUNTY, RANDY | ) | |
| COLEMAN, BILL WINCHESTER, and | ) | |
| MISTY TAYLOR, | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

Plaintiff, a state prisoner proceeding *pro se* and *in forma pauperis*, brings this action pursuant to 42 U.S.C. § 1983 alleging that jail officials violated his constitutional rights while he was incarcerated in the Garfield County Detention Center (GCDC).  This matter has been referred for proceedings consistent with 28 U.S.C. § 636(b)(1)(B) and (C).

Two motions are pending before this Court.  Defendant Garfield County has filed a Motion for Summary Judgment and Brief in Support [Doc. #63] (Defendant County's Motion), and the individual Defendants, Bill Winchester, Misty Taylor, and Randy Coleman have filed a separate Motion for Summary Judgment and Brief in Support [Doc. #64] (GCDC Defendants' Motion).  Plaintiff has responded to both Motions [Doc. #73] (Plaintiff's Response), and the Defendants have filed a consolidated reply to Plaintiff's Response [Doc. #74] (Defendants' Reply).

---

[1]Claims against the Oklahoma State Department of Health were dismissed on the basis of Eleventh Amendment immunity on February 27, 2007.  *See* Order [Doc. #36] adopting a prior Report and Recommendation [Doc. #35].

For the reasons set forth below, it is recommended that Defendant Garfield County's Motion for Summary Judgment be granted and that the GCDC Defendants' Motion for Summary Judgment be granted in part and denied in part.

## I.   Background and Claims Presented

Plaintiff was incarcerated in the GCDC from September 26, 2004, through December 2, 2004, and from December 31, 2004, until he was transferred into the custody of the Oklahoma Department of Corrections on April 4, 2006.[2]   Plaintiff's Response at 6. In the Nature of the Case section of his Complaint, Plaintiff summarizes the bases for his claims.   He states that jail officials denied him basic human needs, forcing him "to sleep on the floor for 90 days without a mattress [and] eat with his fingers, subjecting [him] to Inhumane Conditions, denying [him] appropriate medical care."   Plaintiff further states the Defendants have "willfully disregarded his [medical] condition to punish [him] for exercising the protected right of petitioning the Court for proper redress."   Complaint at 2.   Plaintiff states that he suffered irreparable injury from the deliberate conduct of jail officials.

---

[2]When Plaintiff filed his Complaint in this case on May 17, 2006, he stated that he was being held at GCDC as a pretrial detainee.  On October 24, 2006, the Court received notice indicating that Plaintiff had been transferred to a Department of Corrections (DOC) facility in Lexington, Oklahoma.  The DOC website indicates that Plaintiff was convicted in Garfield County District Court on March 7, 2006, and again on December 12, 2006, on a separate charge.  *See* www.doc.state.ok.us.  Therefore, some of the time Plaintiff spent at GCDC was after he had been convicted.  Claims based on the conditions of confinement of a pretrial detainee arise under the Due Process Clause while the Eighth Amendment's prohibition against cruel and unusual punishment applies to convicted prisoners.  The standard for reviewing due process claims is, however, the same as the standard for reviewing Eighth Amendment claims.  *See Lopez v. LeMaster*, 172 F.3d 756, 759 n. 2 (10th Cir. 1999).

In Count I, Plaintiff alleges that the "totality of unconstitutional conditions" subjected him to substantial risk of serious harm violating his right to be free of cruel and unusual punishment.  Specifically, Plaintiff states:

> The plaintiff, as a result of the defendants Taylor, Winchester, Coleman, [and] Garfield County . . . , was deprived of Basic Humane Conditions.  Conditions existed that deprived him of food[,] exercise, clothing, sanitation and hygiene, exposing [him] to extremely cold temperatures maliciously and sadistically, meant to cause harm, rather than keep order.  The plaintiff even after being sentenced . . .  remained confined under extreme and harsh conditions, even the denial of medical.

Complaint at 4.

In Count II, Plaintiff alleges that jail officials censored and withheld his legal mail.

He claims that he was denied access to the courts and his attorney:

> [Jail officials] violated Plaintiff's First Amendment Rights when the Defendant[s] denied him legal correspondence by placing all legal mail in his property without his knowledge and opened and inspected it without him being present or him giving them consent.  The defendants Taylor, Coleman and Winchester deliberately denied the plaintiff his legal correspondence in an effort to prevent the Plaintiff from filing on them. . . .  On March 1st 2006, along with (2) Sheriffs Deputies who were changing the plaintiff out for trial, [Plaintiff] discovered (23) Twenty-Three "legal letters" from the Law Firm of Collins Zorn and Wagner, in the Plaintiff's clothes bag that had not been given to the plaintiff.  In a conversation with Dorothy Tabor (a supervisor) on 1-17-06 she informed the plaintiff that Randy Coleman, and Misty Taylor and Bill Winchester told her to deny plaintiff all his mail.  Plaintiff was also denied several legal visits with his atty by defendant Randy Coleman.

Complaint at 4.

In Count III, Plaintiff claims he was deprived of liberty and property in violation of the Due Process Clause:

> The defendants Garfield County, Taylor, Winchester, Coleman . . . , punished
> the plaintiff so severely that other jailers and inmates reacted with horror and
> surprise[.]   Plaintiff was subjected to indefinite confinement in the hole
> without being afforded [a] due process hearing for 17 months under harsh
> restrictions so removed from ordinary prison life and that said treatment held
> no legitimate penological purpose except to impose a significant and atypical
> hardship on the plaintiff and to severely punish him or subject him to extreme
> circumstances that would justify impermissible use of force if the plaintiff
> fail[ed] to comply.   The defendants confiscated and threw away several legal
> books and other items of value out of plaintiff's property in retaliation for the
> plaintiff filing suit.

Complaint at 5.

## II.   <u>Standard of Review for Motions for Summary Judgment</u>

Summary judgment should be granted where "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue of material fact and that the moving party is entitled to a judgment as a

matter of law."  Fed. R. Civ. P. 56(c).

 The Tenth Circuit has explained:

> When applying this standard, [a court] view[s] the evidence and draw[s]
> reasonable inferences therefrom in the light most favorable to the nonmoving
> party.   Although the movant must show the absence of a genuine issue of
> material fact, he or she need not negate the nonmovant's claim.   Once the
> movant carries this burden, the nonmovant cannot rest upon his or her
> pleadings, but must bring forward specific facts showing a genuine issue for
> trial as to those dispositive matters for which he or she carries the burden of
> proof.   The mere existence of a scintilla of evidence in support of the

nonmovant's position is insufficient to create a dispute of fact that is 'genuine'; an issue of material fact is genuine only if the nonmovant presents facts such that a reasonable jury could find in favor of the nonmovant.

*Garrison v. Gambro, Inc.*,  428 F.3d 933, 935 (10th Cir. 2005).[3]

## III.    Summary Judgment Motion of Defendant Garfield County

### A.    Personal Jurisdiction

Plaintiff has named Garfield County as a defendant in this action.  Under Oklahoma law, however, a county may be sued only in the name of the "Board of County Commissioners of the County of _____."  Thus, Plaintiff should have named the "Board of County Commissioners of Garfield County."  *See* Okla. Stat. tit. 19, § 4 (2001); *see also Green Construction Co. v. Oklahoma County*, 50 P.2d 625, 627 (Okla. 1935) (finding requirements of predecessor statute mandatory).  Defendant Garfield County raises this defect as a basis for dismissal, contending that Garfield County has not been properly named or served.

The requirement of personal jurisdiction is intended to protect a defendant's liberty interests, and because it represents an individual right, it can be waived. *See Insurance Corporation of Ireland , Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702-703 (1982).  In this case, Garfield County has submitted a summary judgment motion, as discussed below, that attacks the validity of Plaintiff's claims on the merits, attaching evidentiary matters outside the pleadings in support of its Statement of Uncontroverted Facts.

---

[3]In the following analysis, all references to page numbers of documents are to the page numbers assigned by the Court's electronic case filing system, and not to typed or handwritten page numbers that may differ.

The primary evidence upon which this Defendant relies is an agreement between the Board of County Commissioners of Garfield County and another entity.  By affirmatively seeking summary judgment on this basis, Garfield County invites the Court to dispose of the case on its merits, as if the Board of County Commissioners had been properly named, rather than disposing of the case based on  a curable defect in pleading and service.  Under these circumstances, Garfield County's objection to personal jurisdiction should be deemed waived.  *See e.g.*, *Showell v. US Airways, Inc.*, 2007 WL 3275131 (W.D.N.C. Nov. 2, 2007) (unpublished op.) (finding that party who joined in motion for summary judgment and affirmatively requested that the Court adjudicate the case on the merits waived its defenses of insufficiency of process and insufficiency of service).

    **B.**    <u>Summary Judgment On the Merits in Favor of Defendant Garfield County</u>

In *Monell v. Department of Social Services of the City of New York*, 436 U. S. 658, 691 (1978), the Supreme Court held that a municipality or other local governmental unit cannot be held liable under 42 U.S.C. § 1983 for the unauthorized acts of its agents.  A municipality can incur liability, however, if "action pursuant to official municipal policy of some nature caused a constitutional tort."  *Id.*  The policy must be the "moving force" behind the constitutional violation.  *See, e.g., Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1215 (10th Cir. 2003) (*citing Monell* at 691); *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 820 (1985); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-85 (1986).  A municipality's conduct constitutes the "moving force" behind the injury alleged when that conduct is

6

deliberate and a causal link exists between the municipal action and the deprivation of federal rights. *See Board of County Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 404 (1997).

In his Complaint, Plaintiff states that he was subjected to "inhumane conditions" and denied "appropriate medical care" and that "the policy practice and custom of Garfield County . . . was the moving force behind the deprivations of the Plaintiff's rights." Complaint at 2.

Defendant Garfield County contends that it is not responsible for the operating policies of the jail and as support has submitted a pertinent governmental contract, the Operation, Maintenance and Administration Agreement (Agreement), as Exhibit 1 to its Motion for Summary Judgment.   The Agreement dated January 1, 2003, is between the Board of County Commissioners of Garfield County and the Garfield County Criminal Justice Authority (Authority).   The Agreement recognizes that the Board of County Commissioners of Garfield County is "authorized and directed by law of the State to provide a jail for the safekeeping of prisoners lawfully committed[.]" Exhibit 1 at 2. The Agreement further provides, however, that the "Sheriff of Garfield County, Oklahoma (the 'Sheriff') is authorized and directed to have charge of the County jail of Garfield County and of all persons by law confined therein[.]" *Id.*

As for the day-to-day operation of the jail, the Agreement provides:

The Sheriff shall operate the System, on a day to day basis, in compliance with minimum standards adopted by applicable governing agencies and shall obtain and thereafter maintain all certifications required pursuant to Sate laws and the

7

> rules and regulations promulgated by applicable governing agencies as well as any other certification(s) (i) deemed necessary by the County and the Authority and (ii) necessary to incarcerate in the System prisoners of whatever source, whether local, State, federal or, to the extent allowed by State laws, out-of-state.

Defendant Garfield County's Motion, Exhibit 1 at 9.  The Agreement recognizes the Sheriff

as an elected official, solely responsible for management and operation of the jail:

> The Sheriff is and shall be an officer of the County of Garfield, Oklahoma, duly elected and as provided by law, shall have the sole right to supervise, manage, operate, control and direct the performance of the details incident to its duties and obligations under this Agreement.  Nothing contained in this Agreement shall be deemed or construed to create a partnership or joint venture, to create the relationships of employer – employee or principal – agent.  Subject to the provision for an Annual Budget pursuant to Article IV hereof, the Sheriff shall be solely responsible for (and the County and the Authority shall not have obligation with respect to), the interviewing, hiring, training, assignment, control, management, compensation, promotion or termination of the Sheriff's employees who constitute the System's administration and staff.  However, such activities of the Sheriff shall be subject to regular, on-site monitoring by the County and the Authority, and the Sheriff shall furnish reports on such matters to the County and the Authority when so requested.

*Id.* at 9-10.

When a party moves for summary judgment, the opposing party "may not rely merely

on allegations or denials in its own pleading; rather, its response must – by affidavits or as

otherwise provided in this rule – set out specific facts showing a genuine issue for trial."

Fed. R. Civ. P. 56(e)(2).  In his Response, Plaintiff makes the following statements:

> The defendants are attempting to escape this lawsuit by asserting that the Board of Commissioner[s] and the Sheriff are independent entities[.] [H]owever, the plaintiff's numerous injuries are sufficient and states a claim, and that each defendant had personal participation in the numerous events and incidents.  The Defendant Garfield County is directly involved by virtue of its

policy making authority in their official capacity, being that the considered choices with regard to plaintiff's treatment and conditions of confinement impinged on the constitutional rights and that such were well within the Trust Authority mandates acceding control, and custody of the plaintiff.  Clearly through Exhibits #7 #19 #3, the Sheriff of Garfield County is liable in his individual and official capacities.  Garfield County Trust Indenture, A Title 60 Trust Authority confers final policy making authority upon Defendant Winchester and Garfield County.  The defendants implemented and enforced policies and customs (i.e. denying the Plaintiff out of cell exercise) was the moving force behind the deprivation which caused the plaintiff psychological and physical injury.

Plaintiff's Response at 33-34.  This passage merely repeats the allegations Plaintiff made against the County in his Complaint.

Moreover, the exhibits to which Plaintiff refers do not support his claim that this Defendant "is directly involved by virtue of its policy making authority[.]" Exhibit 7 is a copy of a grievance from Plaintiff which asks the recipient to identify "the final policy maker in regards to the operation of this facility."  Plaintiff then asks, "Is it the Sheriff or the Jail Administrators[?]"  The response from Defendant Taylor is, "The Sheriff – I have to answer to him on everything[.]"  Plaintiff's Response, Exhibit 7.  Exhibit 19 is a copy of a letter to Plaintiff from Drew Edmondson, Attorney General of Oklahoma.  From the context of the letter, it appears that Plaintiff had written to the Attorney General complaining about his not having received legal mail.  The letter states that the Attorney General had "forwarded a copy" of Plaintiff's letter to "District Attorney Cathy Stocker and Sheriff Bill Winchester" adding that "[t]hey are responsible for the management of jail facilities in the county."  Plaintiff's Response, Exhibit 19.  Exhibit 3 is a copy of the Jail Standards of the Oklahoma

State Department of Health.  Under Section 310:670-1-3, Implementation and inspection, the document states:

> A local jail administrator shall develop and implement written policies and procedures pertaining to the daily management and operation of the facility. Each facility shall develop and maintain an operations manual sufficient to demonstrate compliance with the standards in Section 1 of Subchapter 3 of this Chapter, or Section 1 of Subchapter 5 of this Chapter.

Plaintiff's Response, Exhibit 3 at 3.  The exhibits proffered by Plaintiff not only fail to support his claim that Defendant Garfield County is the policymaker for the jail, they actually lead to a contrary conclusion.

In sum, the pleadings and evidentiary materials before the Court, viewed even in the light most favorable to Plaintiff, show that there is no genuine issue of a material fact.  In Garfield County at times pertinent to this action, it has been the Sheriff, and not the Board of County Commissioners of Garfield County, who is responsible for the operations of the county jail, and the Board of County Commissioners is not charged with the duty to make policies for its operation.  Since Plaintiff's claims against Defendant Garfield County are premised on its alleged policymaking role in the operation of the county jail, Defendant Garfield County (through its Board of County Commissioners) is entitled to summary judgment as a matter of law, and its Motion for Summary Judgment should be granted on that basis.

**IV.    GCDC Defendants' Motion for Summary Judgment**

The individual GCDC Defendants have also moved for summary judgment.  In their

Motion [Doc. #64], these Defendants assert two affirmative defenses.  They allege that

Plaintiff has failed to satisfy the exhaustion requirement of the Prison Litigation Reform Act

(PLRA), 42 U.S.C. § 1997e(a).  They further contend that they are entitled to qualified

immunity.

**A.    Exhaustion of Administrative Remedies**

The PLRA mandates exhaustion of administrative remedies in actions, such as this

one, challenging prison conditions:

> No action shall be brought with respect to prison conditions under section
> 1983 of this title, or any other Federal law, by a prisoner confined in any jail,
> prison, or other correctional facility until such administrative remedies as are
> available are exhausted.

42 U.S.C. § 1997e(a).  Failure to exhaust administrative remedies is an affirmative defense.

*See Jones v. Bock*, 549 U.S. 199 (2007).

In his Complaint, Plaintiff states that the "Garfield County Detention Facility has a

one step grievance procedure" and that he exhausted his administrative remedies by filing

the requisite grievances.  Complaint at 6.  According to the "Statement of Uncontroverted

Facts" in the GCDC Defendants' Motion, however, "[i]f the inmate is dissatisfied with the

response received regarding a submitted grievance, he can appeal to the Garfield County

Sheriff."  GCDC Defendants' Motion at 16 ¶60.  The GCDC Defendants allege in their

"Statement of Uncontroverted Facts" that Plaintiff "admits that he failed to exhaust his

administrative remedies by never appealing any of his numerous grievances, stating that Garfield County has a one-step grievance procedure." *Id.* ¶ 62.   In support of their contention that GCDC's grievance policy includes an appeal to the Sheriff, the GCDC Defendants have attached a few pages from a document that appears to describe the grievance procedure for GCDC.  *See* GCDC Defendants' Motion, Exhibit 16.  No cover page, effective date or other identifying information is included with the exhibit.

In his Response, Plaintiff disputes the existence of a two-step grievance procedure. *See* Plaintiff's Response at 16-17 ¶ 31.  Plaintiff states the Inmate Handbook to which he had access does not indicate that an inmate can appeal the denial of a grievance to the Sheriff. Plaintiff has attached a copy of the Inmate Handbook to which he refers as Exhibit 5 to his Response.  The paragraph defining a "Formal Grievance" does not mention any form of appeal.  *See* Response Exhibit 5 at 3.

In their Reply to Plaintiff's Response, the Defendants acknowledge Plaintiff's exhibit, but offer the following explanation in support of their affirmative defense:

> In support, Plaintiff attached copies of an "Inmate Handbook" to his Response. Defendants would note that the handbook that Plaintiff offers indicates that it was reviewed in April 2005. . . .  Subsequent to the handbook Plaintiff relies upon, the Detention Center adopted a new set of policies and procedures, portions of which are attached to Plaintiff's Responses at Exhibits 26-31. Defendants have attached a copy of the Garfield County Detention Center's Policy and Procedure Manual,[4] which include the above-referenced sections Plaintiff attached to his Response.

---

[4] The actual title of the handbook is "Garfield County Detention Facility Policy & Procedures Manual."  Defendants' Reply Exhibit 1 at 10.

Defendants' Reply at 3.  The Defendants suggest that the manual attached to the Reply governs the grievance procedure to which Plaintiff was subject.  The Court notes, however, that Defendants have failed to inform this Court, through affidavits or otherwise, as to when the "new set of policies and procedures" were adopted.  Moreover, according to the GCDC Defendants' "Statement of Uncontroverted Facts," Plaintiff was incarcerated in GCDC from September 26, 2004, off and on through April 2006.[5]  GCDC Defendants' Motion at 6, ¶ 1. If the new policies and procedures were adopted "[s]ubsequent to the handbook Plaintiff relies upon," then it stands to reason that the Handbook Plaintiff has offered as evidence was in effect during part or all of the time Plaintiff was incarcerated in GCDC.  Moreover, Plaintiff has attached a sworn affidavit to his Response stating that the GCDC Defendants "revised and amended thier [sic] policies during the course of this litigation[.]"  Plaintiff's Response, Exhibit 2 at 3.  Finally, on September 22, 2006,[6] Plaintiff filed an Inmate Request to Staff  addressed to the Jail Administrator:

> Is there an appeal process after an I/M files his initial step-1 grievance with this office?  After you decide on the grievance, is the decision final, or can the I/M appeal to the Sheriff?  What is the actual process – since thier [sic] exist no guidelines in the I/M Handbook that this facility hands out.

---

[5]Plaintiff was also transferred back to the GCDC from DOC custody several times for judicial proceedings involving other charges, most of which appear to have arisen during his incarceration in the GCDC and many of which were dismissed.

[6]The Court takes notice of the docket sheet for Case No. CF-2005-837, Garfield County District Court which can be found at http://www.oscn.net.  It appears from the docket that Plaintiff had been transferred from DOC custody to the GCDC where he was incarcerated on September 22, 2006, for a jury trial on charges of Possession of Contraband by an Inmate and Assault and Battery on a Correctional Officer.

Plaintiff's Response Exhibit 6.   The answer to the request states: "First it will go to supervisor then Randy and then me."  The "Signature of Officer Disposing Request" is "M. Taylor."[7]  The answer to Plaintiff's Request to Staff could lead to several inferences.  The first and most reasonable inference is that the "new policies and procedures" which include an appeal to the Sheriff were not in effect as of September 22, 2006.  The second inference would be that the "new policies and procedures" were in effect, but the jail administrator did not know about them.  Under this scenario, it would be unreasonable to determine that such new remedial procedures were "available" to Plaintiff when they were unknown even to the jail administrator.  A third inference would be that the "new policies and procedures" were in effect, that the jail administrator did know about them, and that she misled Plaintiff about the appeal process.  Under this scenario, a finding that the new procedures were "available" to Plaintiff would also clearly be unreasonable.  On this record, and viewing the evidence and reasonable inferences therefrom in the light most favorable to Plaintiff, there is a genuine dispute of fact material to whether Plaintiff exhausted the administrative remedies available to him.  The GCDC Defendants have not met their burden of proving that Plaintiff did not exhaust his administrative remedies, and they are not entitled to summary judgment on their affirmative defense.

---

[7]Defendant Misty Taylor is identified by Plaintiff as a "Jail Administrator."  Complaint at 3.

B.      **Qualified Immunity**

The GCDC Defendants (Sheriff Bill Winchester and Jail Administrators Randy Colemen and Misty Taylor) assert they are entitled to qualified immunity as to all of Plaintiff's claims.  They contend that they are entitled to qualified immunity because the alleged deprivations that Plaintiff endured at GCDC do not rise to the level of constitutional violations.  *See* GCDC Defendants' Motion at 17-27.  These Defendants also argue that "even assuming a constitutional violation," their decisions and actions were "more than reasonable" in light of Plaintiff's own conduct.  *Id.* at 28.

The Tenth Circuit Court of Appeals recently restated the proper analysis of a motion for summary judgment based on a qualified immunity defense:

> When a defendant asserts a qualified immunity defense, the burden shifts to the plaintiff, who must first establish that the defendant violated a constitutional right.  If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.  If, on the other hand, a violation has been shown, the plaintiff must then show that the constitutional right was clearly established.  This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition. The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation.   Summary judgment based on qualified immunity is appropriate if the law did not put the officer on notice that his conduct would be clearly unlawful.

*Price-Cornelison v. Brooks* 524 F.3d 1103, 1108 (10th Cir. 2008) (*citing* and *quoting Cortez v. McCauley*, 478 F.3d 1108, 1114-15 (10th Cir. 2007)).  Although the "clearly established" prong of the test for qualified immunity must be considered in light of the specific context

of the case, "[t]he Supreme Court has explained that 'officials can still be on notice that their

conduct violates established law even in novel factual circumstances.'" *Cortez* at 1114-1115

(*quoting Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

If a plaintiff meets his heavy two-part burden to show that the alleged actions of a

defendant, if proven, violate clearly established constitutional rights, the court must then

consider whether the defendant is otherwise entitled to summary judgment:

> If the plaintiff indeed demonstrates that the official violated a clearly
> established constitutional or statutory right, then the burden shifts back to the
> defendant, who must prove that no genuine issues of material fact exist and
> that the defendant is entitled to judgment as a matter of law. In the end,
> therefore, the defendant still bears the normal summary judgment burden of
> showing that no material facts remain in dispute that would defeat the qualified
> immunity defense. When the record shows an unresolved dispute of historical
> fact relevant to the immunity analysis, a motion for summary judgment based
> on qualified immunity should be properly denied.

*Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002) (internal citation and

quotation omitted).

### 1.    Count One: Unconstitutional Conditions of Confinement

Plaintiff challenges as unconstitutional the deprivation of "food[,] exercise, clothing,

sanitation and hygiene" that he experienced during his administrative segregation at GCDC.

Complaint at 4. He further states that he was exposed to extremely cold temperatures

without adequate bedding and that he was denied medical care. Complaint at 4. Plaintiff's

fact allegations regarding the conditions of his confinement are set out more specifically in

his Response to the Defendants' Motion, and Plaintiff has submitted evidence in the form of

his sworn deposition testimony (Response Exhibit 1) and his sworn affidavit (Response Exhibit 2).

The GCDC Defendants do not deny Plaintiff's fact allegations regarding the conditions of his confinement at GCDC. Rather, they argue either that the deprivations Plaintiff endured were rationally related to legitimate penological purposes, *see* GCDC Defendants' Motion at 23, 28 and 29, or that the deprivations were not sufficiently serious to rise to the level of constitutional violations because Plaintiff has shown no resulting injury. *See* GCDC Defendants' Motion at 27, 29. The following analysis addresses Plaintiff's conditions of confinement in turn to determine whether the GCDC Defendants are entitled to qualified immunity at the summary judgment stage.

### (a)  Lack of Adequate Clothing, Bedding, Sanitation and Hygiene

Plaintiff states in his Affidavit that the GCDC Defendants "remove[d] everything out of [his] cell, including mattress, clothes, books, legal papers, blankets, shoes, sheets." Plaintiff's Response, Exhibit 2 at 2. He states that he was "left nude in cell A-1 for a total of (4) months during the winter." *Id.* During this period, Plaintiff states that he was "forced to sleep on the floor of his cell (concrete) or either a cold steel [sic]. *Id.* Plaintiff further states that he was denied toothpaste, toothbrush and toilet paper, was forced to eat with his fingers, and was denied showers. *Id.*

In *Rhodes v. Chapman*, 452 U.S. 337 (1981), the Supreme Court held that in a challenge to prison conditions under the Eighth Amendment the courts must look to the

totality of conditions to determine whether the alleged deprivations deny "the minimal civilized measure of life's necessities." *Id.* at 349.

> [T]he Eighth Amendment prohibits punishments which, although not physically barbarous, involve the unnecessary and wanton infliction of pain, or are grossly disproportionate to the severity of the crime[.]

*Id.* at 346 (internal quotations and citations omitted). *See also Farmer v. Brennan*, 511 U.S. 825, 832, 834 (1994) (concluding that a sufficiently serious deprivation must result in the denial of "the minimal civilized measure of life's necessities" such as shelter, sanitation, food, personal safety, medical care, and clothing) (*quoting Rhodes v. Chapman*, 452 U.S. 337 at 347)).

Regarding the analysis of the constitutionality of prison conditions, the Tenth Circuit has stated:

> It is important to consider the conditions of confinement as a whole because several deprivations "in combination" may constitute a constitutional violation "when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need, such as food, warmth, or exercise – for example a low cell temperature at night combined with a failure to issue blankets." *Wilson v. Seiter*, 501 U.S. 294, 304 (1991). Overall, "[t]he [Eighth] Amendment embodies 'broad and idealistic concepts of dignity, civilized standards, humanity and decency.'" *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (*quoting Jackson v. Bishop*, 404 F.2d 571, 579 (8th Cir.1968)).

*Mitchell v. Maynard*  80 F.3d 1433, 1442 (10th Cir. 1996) (parallel citations omitted).  In *Wilson v. Seiter*, 501 U.S. 294, 303 (1991), the Supreme Court adopted the "deliberate indifference" standard for analyzing Eighth Amendment claims based on conditions of confinement.   Therefore, a prisoner must show both that the officials "act[ed] with a

sufficiently culpable state of mind" and that the "alleged wrongdoing was objectively

harmful enough to establish a constitutional violation." *Mitchell v. Maynard* at 1442.

Adequate clothing and nutritionally adequate food are two of the "core areas" of an

Eighth Amendment claim. *Clemmons v. Bohannon*, 956 F.2d 1523, 1527 (10th Cir. 1992).

Plaintiff claims that he was deprived of all clothing and bedding and forced to sleep on a

concrete floor or cold steel for four months during the winter. *See* Plaintiff's Response,

Exhibit 1 at 5; Exhibit 2 at 2. The Tenth Circuit Court of Appeals considered similar claims

in *Mitchell v. Maynard*, *supra*:

> The facts, construed in Mr. Mitchell's favor, indicate Mr. Mitchell was
> stripped of his clothing, placed in a concrete cell, with no heat at a time when
> nighttime temperatures hovered in the mid-fifties, provided no mattress,
> blankets or bedding of any kind . . . , not allowed to leave his cell for exercise
> . . . , and only sometimes allowed minimal amounts of toilet paper.

*Mitchell v. Maynard* at 1442. The Tenth Circuit found that these conditions constituted "a

significant departure from the 'healthy habilitative environment' the state is required to

provide its inmates." *Id.* (*quoting Ramos v. Lamm*, 639 F.2d 559, 568 (10th Cir. 1980)).

The GCDC Defendants attempt to distinguish *Mitchell v. Maynard*, even though

Plaintiff's allegations are very similar to those of Mr. Mitchell. According to the GCDC

Defendants, *Mitchell v. Maynard* is distinguishable from this case because Mr. Mitchell,

unlike the Plaintiff in this case, was innocent of any wrongdoing before the harsh conditions

of confinement were imposed. As in *Mitchell*, however, the record in this case contains

disputed fact issues regarding Plaintiff's involvement in wrongdoing. But in any event, the

Tenth Circuit in *Mitchell* rejected the defendants' contention that the alleged "numerous and

inhumane" conditions were necessary to maintain security. *Id.* at 1443. The Tenth Circuit stated that it was particularly "troubled by the lack of heat combined with the lack of clothing and bedding, the deprivation of exercise for an extensive period of time . . . , [and] the denial of toilet paper[.]" *Id.* The Court noted that it had previously "agreed it was cruel and unusual punishment to keep an inmate naked for twelve days in a cell that had been stripped of its bedding, did not have adequate heating, ventilation, lighting or furnishing and was seldom clean." *Id.* (*citing Gregory v. Wyse*, 512 F.2d 378, 381 (10th Cir. 1975)).

Significantly, the GCDC Defendants do not deny Plaintiff's allegations about the nature and extent of the deprivations, nor do they deny that adequate clothing, bedding, sanitation and warmth are basic necessities of civilized life. Rather, they contend that Plaintiff "abused his right to several basic necessities[.]" GCDC Defendants' Motion at 26. But the Tenth Circuit's analysis and holding in *Mitchell v. Maynard* are again instructive. In *Mitchell,* one of the defendants authorized the cells to be stripped, claiming that clothing and bedding were privileges. *See Mitchell v. Maynard* at 1439. In finding that the defendants were not entitled to summary judgment on the plaintiff's claim regarding deprivation of clothing and bedding, the Tenth Circuit Court of Appeals implicitly rejected the notion that a prisoner must earn the right to be provided such necessities. Indeed, the Supreme Court's holding in *Farmer v. Brennan*, *supra*, supports the conclusion that adequate clothing and bedding are necessities and not privileges which must be earned.

In light of the clearly established law regarding prisoners' right to adequate clothing, bedding, sanitation and hygiene, Plaintiff has met his two-part burden to show that the

alleged deprivation, if proven, violated clearly established constitutional rights.  And the GCDC Defendants have not shown that there are no disputed fact issues material to whether the deprivations imposed upon Plaintiff were "necessary" to maintain security.  Defendants are not entitled to summary judgment on this claim.

### (b)   Lack of Food

Plaintiff alleges that the GCDC Defendants denied him both food and water for up to ten days and that "such was known and authorized by the Sheriff Bill Winchester, Deputy Jail Administrator Randy Coleman, [and] Jail Administrator Misty Taylor[.]"  Plaintiff's Response, Exhibit 2 at 2.  Plaintiff repeated this charge in his deposition testimony, stating that the longest period without food was ten days.  Plaintiff's Response, Exhibit 1 at 8. Additionally, Plaintiff testified, the GCDC Defendants occasionally instructed the trustees not to give him food.  *Id.*  at 3.  Plaintiff  testified that the lack of food caused rapid weight loss.  He testified that he weighed 215 pounds when he was first incarcerated in GCDC and that his weight dropped as low as 154 pounds.  *Id.*

Plaintiff's allegations regarding the GCDC Defendants' failure to provide food must also survive summary judgment.  The law is well-established that "[p]rison officials must ensure 'inmates receive the basic necessities of [nutritionally] adequate food . . . .'"  *Barney v. Pulsipher*,  143 F.3d 1299, 1310 (10th Cir. 1998) (*citing Farmer v. Brennan*, 511 U.S. 825, 832-833 (1994)); *see also Thompson v. Gibson*, 289 F.3d 1218, 1222 (10th Cir. 2002). "A substantial deprivation of food may be sufficiently serious to state a conditions of confinement claim under the Eighth Amendment," *Thompson*, 289 F.3d at 1222, where the

prison officials demonstrated "deliberate indifference," *Estelle v. Gamble*, 429 U.S. 97, 105 (1976).

In their "Statement of Uncontroverted Facts," the GCDC Defendants acknowledge Plaintiff's contention that he "once went 10-12 days without receiving food." GCDC Defendants' Motion at 6 ¶ 3. They do not deny this allegation, nor do they deny Plaintiff's allegations that they withheld food to punish Plaintiff. Rather, the GCDC Defendants contend that "jail staff had legitimate penological reasons for restricting Plaintiff's meal service." GCDC Defendants' Motion at 28.

"[W]hen the conditions of confinement compose the punishment at issue[,] the [c]onditions must not involve the wanton and unnecessary infliction of pain, nor may they be grossly disproportionate to the severity of the crime warranting imprisonment." *Rhodes v. Chapman*, 452 U.S. at 347. Arguably, depriving a prisoner of food for ten days necessarily results in the "wanton and unnecessary infliction of pain." Additionally, viewed in the light most favorable to Plaintiff, the nonmoving party, a genuine issue of material fact exists regarding whether the punishment – withholding food – is "grossly disproportionate" to the severity of the crime – in this case, Plaintiff's failure to return food trays and other items. [8] This factual dispute is "genuine" because the evidence and the inferences drawn therefrom, when viewed in the light most favorable to Plaintiff, are "such that a reasonable jury could

---

[8] Plaintiff testified in his deposition that he kept some of the paper plates while he was in "the hole" because he used them to sleep on. He also testified that at times he "kept a tray or something to try to get the officer down to the pod so that I could talk to him." Response Exhibit 1 at 8. He cites one incident on January 10, 2005, in which he withheld his tray in order to obtain the attention of jail officials regarding his swollen face and his need for medical attention. Response at 26.

return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The GCDC Defendants are not entitled to summary judgment on this claim.

### (c)      Deliberate Indifference to Serious Medical Needs

Plaintiff alleges that the GCDC Defendants were deliberately indifferent to his serious medical needs. Plaintiff states that he is lactose intolerant and must have a specialized diet and medications. Plaintiff contends that the GCDC Defendants instructed "Nurse Kim Johnson, to refuse the Plaintiff of any medical attention[.]" Plaintiff's Response at 25. Plaintiff states that he had bouts of diarrhea and irritable bowel syndrome because he was denied medication. He further states that he was denied his blood pressure medication. *Id.* In his deposition testimony, Plaintiff testified that he suffered throbbing headaches without his blood pressure medication. Plaintiff's Response, Exhibit 1 at 7. Plaintiff also states that he reported an infection to the GCDC Defendants on January 6, 2005, but that he was not transported to the emergency room until January 10, 2005. Plaintiff's Response at 26.

It has been well-established for over thirty years that a prison official's deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment's ban on cruel and unusual punishment if the deliberate indifference "constitutes the unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (internal citation and quotation marks omitted). To prevail on a claim under 42 U.S.C. § 1983, "a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.* at 106. The Supreme Court clarified the standards applicable to deliberate indifference claims in *Farmer v. Brennan*, 511 U.S. 825 (1994). In *Farmer*, the

23

Court set forth the now familiar two-pronged inquiry, comprised of an objective and subjective component. Under the objective inquiry, the alleged deprivation must be "sufficiently serious" to constitute a deprivation of constitutional dimension. *Id.* at 834. Under the subjective inquiry, the prison official must have a "sufficiently culpable state of mind." *Id.* In describing the subjective component, the Court made clear a prison official cannot be liable "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Id.* at 842. A prisoner may also satisfy the subjective component by showing that defendants' delay in providing medical treatment caused either unnecessary pain or a worsening of his condition. *See Mata v. Saiz*, 427 F.3d 745, 755 (10th Cir. 2005) (*citing Boretti v. Wiscomb*, 930 F.2d 1150, 1154-55 (6th Cir.1991) ("prisoner who suffers pain needlessly when relief is readily available has a cause of action against those whose deliberate indifference is the cause of his suffering")).

The GCDC Defendants state that a special menu was prepared to meet Plaintiff's medical needs. *See* GCDC Defendants' Motion, Exhibit 2. They also contend that Plaintiff "chose to forego the receipt of medication and he chose to forego his meals" and that Plaintiff was "hoarding his medication, evidence that he was not taking all of the medication distributed to him." GCDC Defendants' Motion at 27. The GCDC Defendants do not

24

address Plaintiff's allegation that they instructed Nurse Kim Johnson to refuse the Plaintiff any medical attention, nor do they address Plaintiff's claim of delay in receiving medical attention for the infection.

In his Response, Plaintiff states that he "hoarded" medicine only when he needed to take the medicine with a meal.  He further states that he refused to take medications only when he "did not trust the individual passing it out," and then only when he "observed the medication and noticed that it wasn't what he was prescribed to take at that time[.]" Plaintiff's Response at 25.

Viewing the facts in this case in the light most favorable to Plaintiff, a factfinder could conclude that the GCDC Defendants' actions violated Plaintiff's Eighth Amendment rights based on deliberate indifference to his serious medical needs.  The GCDC Defendants are not entitled to summary judgment on this claim.

### (d)    Lack of Exercise

Plaintiff states that he was confined in disciplinary segregation for seventeen months with no opportunity for out-of-cell or outdoor exercise.  Plaintiff's Response at 33.

As with all  Eighth Amendment claims, a claim based on deprivation of outdoor exercise requires that a plaintiff allege facts demonstrating that "the deprivation is sufficiently serious" and that prison officials acted with "deliberate indifference to inmate health or safety." *Perkins v. Kansas Department of Corrections*, 165 F.3d 803, 809 (10th Cir. 1999).  In *Fogle v. Pierson*, 435 F.3d 1252, 1259 -1260 (10th Cir. 2006), the Tenth Circuit Court of Appeals reversed the district court's judgment in favor of defendant prison officials

on the plaintiff's allegation that he had been denied outside exercise for three years.  The

district court had granted summary judgment to the defendants because plaintiff (1) had not

alleged that he was deprived of all opportunity for exercise and (2) had not alleged that DOC

officials acted with deliberate indifference.  The Tenth Circuit Court of Appeals held that

"the district court erred as a matter of law in concluding that a prisoner must allege denial

of all exercise, not just outdoor exercise, to present an 'arguable' claim."  *Id.* at 1260.  The

Tenth Circuit explained:

> There is substantial agreement among the cases in this area that some form of
> regular *outdoor* exercise is extremely important to the psychological and
> physical well being of inmates, and some courts have held a denial of *fresh air
> and exercise* to be cruel and unusual punishment under certain circumstances.

*Fogle* at 1260 (quotation and citation omitted) (emphasis added in original).  *See also*

*Perkins*, 165 F.3d at 810 (concluding that the district court erred when it held that plaintiff's

allegations about the extended deprivation of outdoor exercise showed no excessive risk to

his well-being); *Housley v. Dodson*, 41 F.3d 597, 599 (10th Cir. 1994) ( "Although we have

never expressly held that prisoners have a constitutional right to exercise, there can be no

doubt that total denial of exercise for an extended period of time would constitute cruel and

unusual punishment prohibited by the Eighth Amendment.").

The Tenth Circuit also noted in *Fogle* that for a prison official to be found liable of

deliberate indifference, the prison official must have the requisite knowledge of substantial

harm.  *See Fogle* at 1260 (*citing Perkins* at 809-810).  The district court had dismissed the

plaintiff's claim based on the fact that the plaintiff had failed to allege deliberate indifference

on the part of prison officials.  The Tenth Circuit rejected the district court's dismissal of the

prisoner's claim and concluded:

> Here, we think it is clear that a factfinder might conclude that the risk of harm
> from three years of deprivation of any form of outdoor exercise was obvious
> and that DOC officials disregarded that risk by keeping Fogle in administrative
> segregation.

*Fogle* at 1260.

In the instant case, the GCDC Defendants contend that they are entitled to summary

judgment because Plaintiff "makes no specific claim that the lack of exercise and recreation

caused him any psychological or physical harm."  GCDC Defendants' Motion at 29.  They

further rely on the fact that Plaintiff admitted that "even when he was so confined, he had

room to do push-ups, sit-ups, and jumping jacks in his cell."  *Id.*  Arguments identical to

these were rejected by the Tenth Circuit Court of Appeals in *Fogle*.  In this case, a factfinder

might conclude that the risk of harm from seventeen months of deprivation of any form of

outdoor exercise was obvious and that the GCDC Defendants disregarded that risk by

keeping Plaintiff in segregation.  The GCDC Defendants are not entitled to summary

judgment on this claim.

### (e)      "Reasonableness" of Defendants' Actions

The GCDC Defendants, as noted earlier, contend that "even assuming a constitutional

violation" their decisions and actions were "more than reasonable" in light of Plaintiff's own

conduct.  *See* GCDC Defendants' Motion at 28.  For instance, the "Statement of

Uncontroverted Facts" sets out many instances in which Plaintiff was not served food to

punish him for various acts such as refusing to return meal trays, utensils, bowls and cups. *See* GCDC Defendants' Motion at 9, 10, 12, 13 and 15. The Court assumes that this argument is an effort by the GCDC Defendants to meet the shifted burden of proof, assuming (as this Court finds) that Plaintiff has met his initial heavy two-part burden on qualified immunity. *See Olsen*, *supra*, 312 F.3d at 1312.

In this context, the Court notes that the GCDC Defendants use their "Statement of Uncontroverted Facts" as evidence. They have not, however, provided any supporting affidavit from any jail official to substantiate their factual assertions. For some of the "Statement of Uncontroverted Facts," the GCDC Defendants rely on Plaintiff's deposition testimony. Most, however, refer only to Exhibit 3, which consists of a series of unverified "Inmate Notes." In his Response, Plaintiff refutes the Inmate Notes and provides a particularized response to each paragraph of the "Statement of Uncontroverted Facts." Plaintiff also contends that the Inmate Notes "are false and created consisting of numerous acts provoked by them in an attempt to justify or cover-up the constitutional violations that were being imposed against this affiant." Plaintiff's Response, Exhibit 2 at 3.

Thus, to the extent the GCDC Defendants rely upon their assertion that their actions were justified by penological security interests and "more than reasonable" in light of Plaintiff's own conduct, the circumstances have not been established by sufficient evidence. Nor have the GCDC Defendants provided authority for finding that a prisoner's egregious misconduct may justify the extended deprivation of minimal civilized measures of life's necessities such as food, clothing, sanitation and warmth. Viewing the evidence in the light

28

most favorable to Plaintiff, genuine disputed fact issues abound, preventing summary judgment.

**(f)** **Summary of Analysis on Conditions of Confinement Claims**

In sum, viewing the evidence in the light most favorable to Plaintiff, Plaintiff has shown that the alleged conditions of his confinement in administrative segregation, if proven, violated clearly established constitutional rights.  In the next step of the analysis, the GCDC Defendants have failed to meet their sequential burden of showing that no genuine issues of material fact exist and that they are otherwise entitled to judgment as a matter of law. Consequently, their motion for summary judgment should be denied on these claims.

**2.** **Count Two: Access to Courts**

Plaintiff contends that the GCDC Defendants violated his right to access the courts by failing to deliver legal mail to him.  In support of his claim, Plaintiff states that on March 1, 2006, he and two deputies discovered twenty-three letters from counsel for the Defendants in Plaintiff's clothes bag.  Complaint at 4.  This legal mail had not been delivered to Plaintiff.  In his Response, Plaintiff also states that some of his legal mail was opened and read outside his presence and that the majority of his legal mail was never delivered. Plaintiff's Response at 31-32.

To provide inmates a meaningful right to access the courts, "states are required to provide affirmative assistance in the preparation of legal papers in cases involving constitutional rights and other civil rights actions related to their incarceration[.]"  *Simkins v. Bruce*, 406 F.3d 1239, 1242 (10th Cir. 2005) (quotation and citation omitted).  Moreover,

no matter what the type of civil action a prisoner pursues, "states may not erect barriers that impede the right of access of incarcerated persons." *Id.* (quotation and citation omitted). *See also Green v. Johnson*, 977 F.2d 1383, 1389 (10th Cir. 1992) ("Any deliberate impediment to access [to the courts], even a delay of access, may constitute a constitutional deprivation").

Plaintiff's claim that a right of access to the courts has been impeded by the GCDC Defendants' failure to deliver his legal mail requires him "to allege intentional conduct interfering with his legal mail, and does not require an additional showing of malicious motive." *Simkins v. Bruce* at 1242 (*citing Treff v. Galetka*, 74 F.3d 191, 195 (10th Cir. 1996), *Jackson v. Procunier*, 789 F.2d 307, 311 (5th Cir. 1986), and *Washington v. James*, 782 F.2d 1134, 1139 (2d Cir. 1986)). Plaintiff states that the GCDC Defendants "deliberately denied [him] his legal correspondence in an effort to prevent [him] from filing on them." Complaint at 4. He states that one of the supervisors at GCDC informed Plaintiff that the GCDC Defendants had instructed her to withhold all of his mail. *Id.* "Deliberate delay in the delivery of inmate legal mail is sufficient to satisfy the intent requirement for a right-of-access claim." *Simkins v. Bruce* at 1242 n. 3 (*citing Gramegna v. Johnson*, 846 F.2d 675, 677 (11th Cir. 1988); *Jackson*, 789 F.2d at 311)). The Tenth Circuit Court of Appeals has held that "the connection between the act [of] (withholding inmate's legal mail) and the impediment to access (inmate's non-receipt of legal mail) is neither indirect nor unexpected but, rather, immediate and obvious[.]" *Simkins v. Bruce* at 1242 n. 3.

The GCDC Defendants do not dispute the facts alleged by Plaintiff regarding the deliberate withholding of his legal mail.  Their sole ground for summary judgment on this issue is their contention that Plaintiff has suffered no actual injury as a result of the unconstitutional withholding of his legal mail.   Indeed, an inmate must show that non-delivery of his legal mail resulted in "actual injury" by "frustrat[ing]," "imped[ing]," or "hinder[ing] his efforts to pursue a legal claim." *Lewis v. Casey*, 518 U.S. 343, 351-53 & n. 3 (1996).  And in this case, Plaintiff has not made the required showing.  In his Response, Plaintiff states that by "withholding his legal documents and authorizing such" the GCDC Defendants were attempting to "manipulate the Courts into dismissing Plaintiff's suit." Plaintiff's Response at 32.  Plaintiff does not, however, identify any dismissal or other actual injury he incurred as a result of the withholding of his mail.  Based on the record before the Court, the GCDC Defendants are entitled to summary judgment in their favor on this claim.

### 3.    <u>Count Three: Due Process Violation</u>

In his third and final claim, Plaintiff contends that the GCDC Defendants violated his due process rights by confining him in administrative segregation ("the hole"), with no disciplinary hearing,  for seventeen months.  Plaintiff contends that his segregated confinement included "harsh restrictions so removed from ordinary prison life and that said treatment held no legitimate penological purpose except to impose a significant and atypical hardship on the plaintiff[.]" Complaint at 5.[9]  Plaintiff states he was never told how long he

---

[9]Plaintiff also states that the GCDC Defendants deprived him of property without due process of law when they confiscated and threw away several legal books and other items of value in retaliation for his having filed suit against them.  Complaint at 5.  In his deposition testimony, (continued...)

would be held in segregation and he was never given a review hearing to address his placement status.  Plaintiff's Response at 27-28.

The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law."  "'A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word "liberty," or it may arise from an expectation or interest created by state laws or policies.'"  *Estate of DiMarco v. Wyoming Department of Corrections, Division of Prisons*, 473 F.3d 1334, 1339 (10th Cir. 2007) (*quoting Wilkinson v. Austin*, 545 U.S. 209, 221 (2005)).  Due process protections extend to prisoners, "though the extent of that protection is significantly less than that guaranteed to free persons."  *Estate of Dimarco* at 1339 (*citing Wolff v. McDonnell*, 418 U.S. 539, 555-57 (1974)).

Classification and assignment of a prisoner into segregation does not involve deprivation of a liberty interest independently protected by the Due Process Clause.  *See Meachum v. Fano*, 427 U.S. 215, 225 (1976); *Trujillo v. Williams*, 465 F.3d 1210, 1225 (10th Cir. 2006).  But a liberty interest "may arise from an expectation or interest created by state laws or policies[.]"  *Wilkinson v. Austin*  545 U.S. 209, 221 (2005) (*citing Wolff v. McDonnell*, 418 U.S. at 556-558 (liberty interest in avoiding withdrawal of state-created system of good-time credits)).  A liberty interest in avoiding confinement in a segregated unit

---

[9](...continued)
however, Plaintiff states that the individual who threw away his legal books was ordered to pay him for the books.  He states that he received a check for thirty-eight dollars.  Plaintiff's Response, Exhibit 1 at 10-11.

of a prison or jail may also be created if the segregation imposes "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995).[10]

When a prisoner alleges that his due process rights have been violated by his confinement in segregation, a district court must conduct an evidentiary analysis to determine if either the duration or degree of the confinement was "atypical and significant." *See Trujillo*, 465 F.3d at 1225 (reversing dismissal of due process claim where prisoner alleged that he spent 750 days in segregation compared to other inmates' stays of 180 days); *Fogle v. Pierson*, 435 F.3d at 1259 (holding that district court abused its discretion in concluding that three-year period of segregation was not even arguably atypical); *Gaines v. Stenseng*, 292 F.3d 1222, 1225-26 (10th Cir. 2002) (reversing dismissal of due process claim and remanding to district court to determine whether 75-day confinement in disciplinary segregation was itself atypical and significant).

---

[10] *Sandin* held, at the summary judgment stage, that the challenged "discipline in segregated confinement did not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest." *Sandin* at 486. To reach this conclusion, the Court carefully examined the conditions of the prisoner's confinement and compared the conditions with the conditions in other segregated units, ultimately determining that the conditions in the prisoner's disciplinary segregation unit "mirrored those conditions imposed upon inmates in administrative segregation and protective custody." *Id.* In *Sandin*, the Court relied on three factors to determine that the prisoner had no liberty interest in avoiding disciplinary segregation: (1) disciplinary segregation was essentially the same as discretionary forms of segregation; (2) a comparison between the prisoner's confinement and conditions in the general population showed that the prisoner suffered no "major disruption in his environment;" and ( 3) the length of the prisoner's sentence was not affected. *Id.* at 486-487.

The GCDC Defendants contend that "Plaintiff's allegations of due process violations are without merit" because "[t]he Garfield County Detention Facility Handbook clearly states that major rules infractions may be punishable by disciplinary and/or administrative segregation for up to 60 days."  GCDC Defendants' Motion at 30.  But Plaintiff states that he was confined in administrative segregation for seventeen months -- far longer than the typical 60-day limit prescribed by GCDC policy.  Judged against the GCDC's own policy for its inmates -- limiting disciplinary or administrative segregation for major rule infractions to 60 days -- Plaintiff's segregation for seventeen months without any misconduct reports or disciplinary hearing is significant and atypical.

Additionally, Plaintiff describes conditions of confinement that also implicate due process protections.  As discussed *supra* at 15-29, Plaintiff's allegations, if proven, and viewed in the light most favorable to Plaintiff, show that his Eighth Amendment rights were violated while he was in administrative segregation.  These conditions as alleged are, therefore, both significant and atypical.  Accordingly, Plaintiff was entitled to due process before being placed in indefinite administrative segregation under the conditions of confinement alleged in Count One.

Plaintiff's indefinite placement in administrative segregation under the conditions to which he was subjected implicated the protections of the Due Process Clause, and the GCDC Defendants do not argue otherwise.  This Court, therefore, must consider whether the summary judgment record establishes that Plaintiff was afforded the process to which he may have been due.

34

The GCDC Defendants contend that Plaintiff indeed was given the process he was due. Relying on the "Garfield County Detention Facility Handbook," the GCDC Defendants contend that "jail staff may afford the inmate a hearing 'on the spot' and, as long as a legitimate factual basis for the punishment exists, impose such punishment *without injury to due process*." GCDC Defendants' Motion at 30 (emphasis added). The GCDC Defendants' only support for this proposition is their own "Uncontroverted Fact No. 56." GCDC Defendants' Motion at 15.[11]

In *Wilkinson v. Austin*, the Supreme Court considered the nature and degree of process necessary to protect the due process rights of Ohio inmates assigned to Ohio State Penitentiary (OSP), a "Supermax" facility with highly restrictive conditions of confinement.[12] The Court applied the framework set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976), which requires consideration and balancing of three distinct factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural

---

[11]In fact, it is ¶ 57 that corresponds with Defendants' assertion. *See* Defendants' Motion at 16.

[12]The Supreme Court did not hesitate in finding that the highly restrictive conditions in OSP, while perhaps necessary for penological security reasons, "give rise to a liberty interest in their avoidance." *Wilkinson* at 224.

safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Wilkinson* at 224-225 (internal quotation and citation omitted).[13]

Applying these factors, the Court concluded that Ohio's procedure for determining assignment of prisoners to OSP was adequate because it provided inmates notice of the factual basis leading to consideration for OSP placement and a fair opportunity for rebuttal as well as "a short statement of the reasons" for the placement decision. *Id.* at 226. The Court emphasized the importance of notice and opportunity to be heard:

> Our procedural due process cases have consistently observed that [notice and opportunity to be heard] are among the most important procedural mechanisms for purposes of avoiding erroneous deprivations. Requiring officials to provide a brief summary of the factual basis for the classification review and allowing the inmate a rebuttal opportunity safeguards against the inmate's being mistaken for another or singled out for insufficient reason. In addition to having the opportunity to be heard at the Committee stage, Ohio also invites the inmate to submit objections prior to the final level of review. This second opportunity further reduces the possibility of an erroneous deprivation.

*Wilkinson* at 226 (citations omitted). The Court further held that requiring the decisionmaker to provide a short statement of reasons "guards against arbitrary decisionmaking while also

---

[13]Notably, the Ohio procedure for placing inmates in OSP included "multiple levels of review for any decision recommending OSP placement, with power to overturn the recommendation at each level" as well as a thirty-day placement review after an inmate's initial assignment to OSP. *Wilkinson* at 227. These procedures are far removed from the "on the spot" hearing allegedly afforded Plaintiff in this case.

providing the inmate a basis for objection before the next decisionmaker or in a subsequent classification review.  The statement also serves as a guide for future behavior."  *Id.* at 227.[14]

In this case, the GCDC Defendants apparently punished Plaintiff by placing him in administrative segregation with only an "on the spot" hearing.  Such a hearing did not afford Plaintiff notice and opportunity to be heard.  Moreover, there is no indication that Plaintiff was provided a written statement outlining the reasons for the decision.  Although the Due Process Clause does not require a formal adversary hearing before a prisoner is assigned to administrative segregation where he will be subjected to significant and atypical conditions, the Due Process Clause requires at least notice and an opportunity to be heard and a written statement of the reasons for the assignment.  Having failed to provide these minimal due process requirements, the GCDC Defendants are not entitled to summary judgment on Plaintiff's due process claim.

## RECOMMENDATION

It is recommended that Defendant Garfield County's Motion for Summary Judgment [Doc. #63] be granted and that judgment be entered in favor of Garfield County through its Board of County Commissioners.  It is further recommended that the GCDC Defendants' Motion for Summary Judgment [Doc. #64] be granted in regard to Plaintiff's claims in Count II of the Complaint and denied in regard to Plaintiff's remaining claims (Counts I and III).

---

[14]The Court concluded that an inmate need not be afforded the opportunity to call witnesses before being assigned to OSP.  *Id.* at 228. Rather, the Court held, the non-adversary procedures set forth in *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex*, 442 U.S. 1 (1979) and *Hewitt v. Helms*, 459 U.S. 460 (1983) "provide the appropriate model."  *Wilkinson* at 229.

## NOTICE OF RIGHT TO OBJECT

The parties are advised of their right to object to this Report and Recommendation. *See* 28 U.S.C. § 636.  Any such objections must be filed with the Clerk of the District Court by July __22nd__, 2008.  *See* LCvR72.1.  The parties are further advised that failure to make timely objection to this Report and Recommendation waives the right to appellate review of the factual and legal issues addressed herein.  *Moore v. United States*, 950 F.2d 656 (10th Cir. 1991).

## STATUS OF REFERRAL

This Report and Recommendation terminates the referral by the District Judge in this matter.

ENTERED this __2nd__ day of July, 2008.


_____
VALERIE K. COUCH
UNITED STATES MAGISTRATE JUDGE